**MCDERMOTT WILL & SCHULTE LLP**
Joseph B. Evans
Darren Azman
Steven T. Knipfelberg
Daniel H. Kaltman
Joseph Aminov
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400

*Counsel to Blockchain Recovery Investment Consortium, LLC, Litigation Administrator and Complex Asset Recovery Manager, as Representative for the Post-Effective Date Celsius Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>Reorganized Debtors. | Chapter 11<br><br>Case No. 22-10964 (MEW)<br><br>(Jointly Administered) |
| CELSIUS NETWORK LIMITED, CELSIUS NETWORK LLC and affiliated Post-Effective Date Debtors, by and through the Blockchain Recovery Investment Consortium, LLC, acting in its capacity as the Complex Asset Recovery Manager and Litigation Administrator,<br><br>Plaintiffs,<br><br>-against-<br><br>HDR GLOBAL TRADING LIMITED, ABS GLOBAL TRADING LIMITED, 100X HOLDINGS LIMITED, SHINE EFFORT INC. LIMITED, and HDR GLOBAL SERVICES (BERMUDA) LIMITED,<br><br>Defendants. | Adv. Proc. No. ___ - _________<br><br>**<u>COMPLAINT</u>**<br><br>Jury Trial Demanded |

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).

## ADVERSARY COMPLAINT

Plaintiffs Celsius Network Limited and Celsius Network LLC ("Plaintiffs" or "Celsius"), by and through the Blockchain Recovery Investment Consortium, LLC ("BRIC"), acting in its capacity as the Complex Asset Recovery Manager and Litigation Administrator, through its undersigned counsel, file this complaint (the "Complaint") against defendants HDR Global Trading Limited, ABS Global Trading Limited, 100x Holdings Limited, Shine Effort Inc. Limited, HDR Global Services (Bermuda) Limited (collectively, "BitMEX" or "Defendants"), and allege as follows:[2]

## NATURE OF THE CASE

1. This action arises from BitMEX's fraudulent misconduct, wrongful liquidation, and seizure of digital assets worth 6,360.1666 bitcoin ("BTC") belonging to Celsius and JST (defined herein) through two liquidations (collectively, the "Liquidations") occurring just hours apart on March 12 and 13, 2020. The Liquidations were not ordinary trading losses. They were the intended result of BitMEX's fraudulent scheme to generate staggering amounts of revenue at the expense of its own customers.

2. BitMEX controlled the mechanisms that determined whether Celsius's and JST's positions survived: it established the margin requirements governing their positions, determined the prices used to trigger the liquidations, and operated the liquidation engine (the "Liquidation Engine") that took control of their positions once liquidations were triggered. BitMEX used that control to intentionally manipulate the BTC markets, drive prices downward, and fuel cascading

[2] Capitalized terms not immediately defined have the meanings ascribed to them below or in the Plan (defined herein). ECF document numbers in this Complaint refer to ECF document numbers from Case No. 22-10964 (MEW).

liquidations—including the Liquidations that caused Celsius and JST to lose thousands of BTC—for which it profited immensely.

3. While BitMEX made multiple representations that it would maintain an orderly market for its derivatives contracts, BitMEX knew these representations were false. Instead of maintaining an orderly market, BitMEX intentionally designed its platform and liquidation procedures to *cause* liquidations of collateral and defraud its own customers.

4. Starting on March 12, 2020, BTC fell approximately 50% throughout the day, one of the largest one-day declines in its history. Trading activity on BitMEX was enormous. Approximately $12.3 billion in derivatives traded on BitMEX on March 12 alone, nearly one quarter of the approximately $53 billion in cryptocurrency-derivatives volume measured across the market that day. As BTC prices fell, leveraged long positions on BitMEX began to reach and exceed their liquidation thresholds. BitMEX's Liquidation Engine then took control of those positions and closed them into the declining market.

5. Each round of liquidations increased the selling pressure on BitMEX's own derivatives, including the XBTM20 contract at issue here. Lower prices caused additional customer positions to become subject to liquidation, which gave the Liquidation Engine still more positions to sell. Between approximately 09:00 UTC on March 12 and 06:00 UTC on March 13, approximately 1.1 billion long contracts were liquidated on BitMEX.

6. BitMEX's Liquidation Engine itself became a major source of selling. BitMEX later acknowledged that the volume of liquidations left the Liquidation Engine with a "large aggregated long position" to exit and that, as the position grew, its algorithm sold into the market at progressively lower prices.

7. The result was a self-reinforcing liquidation cascade: falling prices triggered BitMEX liquidations; those liquidations generated additional selling; the additional selling pushed prices lower; and the lower prices triggered still more liquidations.

8. Because BitMEX prices influenced major BTC spot exchanges, the effects of that selling were not confined to BitMEX. Downward price pressure originating on BitMEX transmitted to the spot market on other major exchanges, which in turn affected the methodology used by BitMEX to value the Mark Price (defined herein) of its own contracts and determine whether customer positions would be liquidated.

9. On March 12 and 13, 2020, the distortion in the BTC market on BitMEX became extreme. During the selloff, BTC traded on BitMEX materially below prices on other exchanges, and the cascading liquidations of customers' positions were most pronounced on BitMEX.

10. The cascade continued until access to the BitMEX platform was itself disrupted. From approximately 02:16 to 02:40 UTC on March 13, BitMEX alleges that it experienced a distributed-denial-of-service, or "DDoS," attack, which made it nearly impossible for customers to reach BitMEX's trading engine to protect their positions. This event effectively caused the cascading liquidations of XBT on BitMEX to pause, and BTC prices promptly rebounded.

11. The timing was telling. Immediately before the disruption, BTC was trading on BitMEX at a spot price of approximately 3,900 USD/XBT. Once trading on BitMEX became severely impaired, the spot BTC price almost immediately recovered to approximately 5,300 USD/XBT.

12. These events, however, were not the result of a functioning market. Rather, they were by design and the direct result of BitMEX's fraudulent scheme to defraud its own customers. BitMEX promised its customers a fair market. It promised that its pricing system would "avoid

unnecessary liquidations." It promised to maintain an orderly market. It promised that all participants would enjoy "the same access and opportunity," and that its proprietary trading arm operated on the same terms as any other user. Those promises were false.

13. Unbeknownst to Celsius and JST, BitMEX designed and operated a platform that turned market crises into a profit center. When BTC prices fell sharply on March 12 and 13, 2020, BitMEX's Liquidation Engine did not merely respond to the decline—it amplified it—and fueled cascading liquidations and massive sell pressure that drove prices on BitMEX far below every other major exchange.

14. BitMEX did this by: (1) selling liquidated collateral directly on its own exchange and using its exchange price to calculate the Mark Price used to initiate liquidations of customer positions; (2) creating massive "sell walls" by selling unreasonable and irresponsibly large quantities of BTC to create resistance to upward price movement; and (3) entering sell orders dramatically below the prevailing market price of BTC to drive prices downward and fuel additional liquidations. In some cases, and as is relevant here, these sell orders were placed *over 24% below the next best ask price* on BitMEX's own exchange.

15. As the dislocation deepened, BitMEX refused to halt trading despite having the express authority and responsibility to do so. Celsius and JST, like thousands of other BitMEX customers, fell victim to this scheme.

16. BitMEX profited immensely from these liquidations. When BitMEX liquidated a customer's position, it took control of the customer's position and BTC collateral. If BitMEX successfully disposed of the position above the point where it had zero equity and all posted margin had been depleted (the "Bankruptcy Price"), the resulting profit was added to BitMEX's massive

BTC-denominated "Insurance Fund." The Insurance Fund is owned and controlled by BitMEX, and BitMEX also took a significant liquidation fee on the liquidated assets.

17. BitMEX thus controlled the system that determined when its customers would be liquidated while also controlling a fund that grew from successful liquidations. As its customers were liquidated, BitMEX's profits soared.

18. Celsius and JST entrusted their BTC to BitMEX and justifiably relied, to their detriment, on BitMEX's material misrepresentations that the trading and liquidation procedures established for its platform were intended to protect customers.

19. Celsius now brings this action to recover that BTC and for other damages caused by BitMEX's misconduct. Celsius asserts its own claims arising from BitMEX's liquidation of Celsius's XBTM20 position on March 12, 2020 (the "Celsius Liquidation") and, by assignment, claims arising from BitMEX's liquidation of JST's XBTM20 position on March 13, 2020 (the "JST Liquidation"), and seeks the return of the BTC, together with all other relief available at law and in equity.[3]

[3] As explained below, the JST Liquidation was the liquidation of a position held by JST Alpha 1 Ltd. ("JST Alpha"), a Cayman Islands company that acted as the offshore feeder fund to JST Alpha 1 Master Fund Ltd., which fund was managed by JST Asset Management LLC, a Delaware LLC. Celsius invested in JST Alpha by way of a series of subscription agreements entered into between October 2019 and February 2020. Pursuant to an Assignment Agreement dated April 23, 2025, JST Alpha 1 Ltd., JST Asset Management LLC, and JST Alpha 1 Master Fund (collectively, "JST") assigned to Celsius Network LLC and Celsius Network Limited "all of their rights, titles, and interests in and to any and all claims, known or unknown, now or hereafter in existence, concerning the Damages and any other losses suffered as a result of the Liquidation, including without limitation any action or claim of any nature, including tort, statutory, or otherwise." Effective January 31, 2022, JST Alpha 1 Master Fund Ltd. and JST Alpha were "struck off" from the Cayman Islands General Registry. JST Asset Management LLC is still registered under Delaware law. Celsius has initiated the process of coordinating and reinstating the Cayman entities. Section 159 of the Cayman Companies Act provides that, upon restoration of a struck-off company to the register, the company "is deemed to have continued in existence as if its name had not been struck off," *nunc pro tunc*.

## THE PARTIES

20. Celsius Network LLC is a Delaware limited liability company and had its principal place of business in Hoboken, New Jersey. Celsius Network LLC's sole member is Celsius Network Limited.

21. Celsius Network Limited is a private limited company incorporated under the laws of England and Wales and had its principal place of business in London, United Kingdom.

22. On July 13, 2022, Celsius filed voluntary petitions for relief in this Court under Chapter 11 of the Bankruptcy Code. On January 31, 2024, pursuant to the *Eleventh Notice of Filing of Plan Supplement*, BRIC was appointed as the Complex Asset Recovery Manager and Litigation Administrator of Celsius and its affiliated Post-Effective Date Debtors.[4] BRIC is a joint venture of GXD Labs LLC ("GXD Labs") and Van Eck Absolute Return Advisers Corp. ("Van Eck") and is incorporated in Delaware. GXD Labs is incorporated in Florida and maintains its principal place of business in Florida. Van Eck is incorporated in Delaware and maintains its principal place of business in New York.

23. Defendant HDR Global Trading Limited ("HDR") is incorporated in the Republic of Seychelles, company registry number 148707, with its principal office located at Global Gateway 8, Rue de la Perle, Providence Mahé, Seychelles. HDR owns and operates the trading platform BitMEX.

24. Defendant ABS Global Trading Limited ("ABS") is a Delaware corporation wholly owned by HDR. ABS is registered to do business in New York, and is headquartered at 31 Conduit Road, Flat 17B, The Morgan, Hong Kong. During the relevant period, ABS conducted operations

---

4 *See Eleventh Notice of Filing of Plan Supplement*, Ex. C § 2.1 [ECF Doc. No. 4297]. Pursuant to the Litigation Administrator and Complex Asset Recovery Manager Agreement, BRIC is authorized to administer the claims, Causes of Action, and illiquid assets allocated to it for the benefit of the Holders of Claims entitled to receive Litigation Proceeds. *See id.*, Ex. C § 2.1.

in the United States on behalf of BitMEX, including technical and operational functions relating to the BitMEX platform.

25. Defendant 100x Holdings Limited ("100x Group") is a holding company incorporated in Bermuda, company registry number 55678. Upon information and belief, 100x Group is the holding structure for HDR. In July 2020, HDR was restructured to be a subsidiary of the 100x Group.

26. Defendant Shine Effort Inc. Limited ("Shine") is a Hong Kong corporation, company registry number 2129744, and a subsidiary of HDR and 100x Group. Shine was the entity through which BitMEX conducted proprietary trading on the BitMEX platform.

27. Defendant HDR Global Services (Bermuda) Limited ("HDR Bermuda") is a Bermudian company, company registry number 53775. HDR Bermuda employed personnel who performed duties for BitMEX.

**JURISDICTION AND VENUE**

28. This Adversary Proceeding is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

29. This Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because this proceeding is related to the Debtors' jointly administered chapter 11 cases (collectively, the "Chapter 11 Cases") and the confirmed Plan. Pursuant to 28 U.S.C. § 157(a) and the *Amended Standing Order of Reference* of the United States District Court for the Southern District of New York, entered February 1, 2012, proceedings arising under title 11, or arising in or related to cases under title 11, are referred to this Court.

30. The Court's *Findings of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and Its Debtor Affiliates* (the

"Confirmation Order")[5] confirmed the Debtors' Modified Joint Chapter 11 Plan of Reorganization (the "Plan").[6] The Plan provides that, notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, this Court "shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan," including jurisdiction to "resolve any cases, controversies, suits, disputes, Causes of Action, or other matters that may arise in connection with the Recovery Causes of Action brought by the Litigation Administrator(s) in the Bankruptcy Court."

31. The claims asserted in this Adversary Proceeding were preserved for Post-Effective Date prosecution under the Plan. Article IV.S of the Plan provides that each Post-Effective Date Debtor shall retain, and any Litigation Administrator with respect to Recovery Causes of Action may enforce, "all rights to commence and pursue, as appropriate, any and all Causes of Action," including "any actions specifically enumerated in the Schedule of Retained Causes of Action." The Plan further provides that the Litigation Administrators' rights to commence, prosecute, or settle such Causes of Action "shall be preserved notwithstanding the occurrence of the Effective Date."[7]

32. On the Plan's Effective Date, BRIC was designated to serve as Litigation Administrator and Complex Asset Recovery Manager (the "Litigation Administrator") with respect to certain complex asset-recovery and litigation matters. Under the governing agreement, BRIC administers the claims and causes of action allocated to it for the benefit of the holders entitled to receive the resulting Litigation Proceeds.[8] BRIC has been allocated and is administering

---

5 *See* ECF Doc. No. 3972.

6 The Plan was subsequently modified. The conformed version of the Modified Joint Chapter 11 Plan of Reorganization reflecting those modifications was filed on January 29, 2024 [ECF Doc. No. 4289]. Unless otherwise indicated, all citations herein to the Plan are to the conformed Plan filed at ECF Doc. No. 4289.

7 *See* Plan, Art. IV.S.

8 *See Eleventh Notice of Filing of Plan Supplement*, Ex. C § 2.1 [ECF Doc. No. 4297].

the claims against BitMEX asserted in this action, including claims held by Celsius and claims assigned to Celsius by JST. The Schedule of Retained Causes of Action specifically identifies "HDR Global Trading Limited t/a BitMEX" as a defendant to retained claims held by Celsius arising from "negligence, fraud, market manipulation."[9] This action therefore bears a close nexus to the implementation and administration of the Plan, and this Court has jurisdiction over this Adversary Proceeding.

33. This Court has personal jurisdiction over Defendants pursuant to Bankruptcy Rule 7004. Defendants have sufficient contacts with the United States to render the exercise of jurisdiction consistent with the Constitution and laws of the United States. During the relevant period, Defendants purposefully conducted substantial business in the United States in connection with the operation of the BitMEX platform, including through executives, employees, offices, and operations located in New York and elsewhere in the United States. As alleged herein, those U.S.-based activities were integral to the operation of the BitMEX platform and the services giving rise to the claims asserted in this action. Defendants' actions were directed at, and had the intended effect of, causing injury to persons located in the United States, including in this District.

34. Defendants' contacts with the United States were substantial and directly connected to the operation of the BitMEX platform. In 2021, the Financial Crimes Enforcement Network ("FinCEN") found that HDR, 100x Group, ABS, Shine, and HDR Bermuda "operate and do business as an integrated, common enterprise."[10] FinCEN further found that BitMEX "conducted significant aspects of its business and maintained offices in the U.S." and "solicited and accepted

---

[9] *See Tenth Notice of Filing of Plan Supplement*, Schedule of Retained Causes of Action [ECF Doc. No. 4285].

[10] FinCEN, *In the Matter of HDR Global Trading Ltd., 100x Holdings Limited, ABS Global Trading Limited, Shine Effort Inc. Limited, HDR Global Services (Bermuda) Limited d/b/a BitMEX*, Assessment of Civil Money Penalty, No. 2021-02, at 2 (Aug. 10, 2021) (the "FinCEN Assessment").

orders from U.S. persons and other individuals and entities located in the United States."[11] In addition, FinCEN found that BitMEX maintained employees and "at least half of its workforce, at its headquarters in San Francisco, California, and New York, and also operated out of Chicago, Illinois, Milwaukee, Wisconsin . . . ."[12]

35. During the relevant period, BitMEX maintained an office in Manhattan from which employees, including upon information and belief, Gregory Dwyer ("Dwyer"), BitMEX's head of business development, conducted business on behalf of BitMEX. BitMEX also maintained substantial operations elsewhere in the United States, including in San Francisco, and its internal reports identified the United States as a large source of revenue.[13]

36. In 2022, Arthur Hayes ("Hayes"), Benjamin Delo ("Delo"), Samuel Reed ("Reed"), and Dwyer pleaded guilty to violating the Bank Secrecy Act and admitted that BitMEX solicited and conducted business with customers in the United States, including in the Southern District of New York.[14] In 2024, BitMEX pleaded guilty to nearly identical offenses, including that it solicited and conducted business with customers in the United States.[15]

37. This Adversary Proceeding is a non-core proceeding because the claims asserted against Defendants arise from prepetition conduct and exist independently of the Bankruptcy Code. Pursuant to 28 U.S.C. § 157(c)(1), this Court may hear this proceeding and submit proposed findings of fact and conclusions of law to the United States District Court for the Southern District

---

11 *Id*. at 3.
12 *Id*. at 5.
13 *Id*. at 2, 12.
14 *See United States v. Hayes*, No. 1:20-cr-00500-JGK, (S.D.N.Y. Sept. 21, 2020), Indictment ("Hayes Indictment"); *see also United States v. Hayes et al.*, No. 1:20-cr-00500-JGK, Plea Allocutions of Arthur Hayes and Benjamin Delo (S.D.N.Y. Feb. 24, 2022), Samuel Reed (S.D.N.Y. Mar. 9, 2022), and Gregory Dwyer (S.D.N.Y. Aug. 8, 2022).
15 *See United States v. HDR Global Trading Limited a/k/a "BitMEX"*, No. 24-cr-424 (S.D.N.Y. July 10, 2024).

of New York. Plaintiffs consent to the entry of final orders and judgments by this Court pursuant to 28 U.S.C. § 157(c)(2) and Bankruptcy Rule 7008.

38. Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases commenced under the Bankruptcy Code and arises in and/or is related to the underlying consolidated Chapter 11 Cases.

## FACTUAL BACKGROUND

## I. BACKGROUND ON CELSIUS AND ITS CHAPTER 11 PLAN

39. Celsius was a consumer-facing cryptocurrency company that was founded in 2017. Celsius's primary product was a platform that allowed customers to purchase and deposit various cryptocurrencies. Like a traditional bank, Celsius paid interest to customers who deposited cryptocurrency on its platform. Celsius was known to pay some of the highest interest rates in the market to its depositors.

40. To generate revenue, Celsius lent its customer-deposited cryptocurrencies to third parties, who in turn would pay Celsius interest. Celsius used revenue from those loans to pay its customers interest on their deposits.

41. As part of those operations, Celsius maintained trading positions on various cryptocurrency exchanges. Celsius maintained a direct trading account on BitMEX. Celsius also invested in JST Alpha, a Cayman Islands feeder fund managed by JST Asset Management LLC, to obtain exposure to cryptocurrency trading through a separate BitMEX account managed by JST on Celsius's behalf and for its benefit. Trades executed by Celsius and JST (including the trading orders relevant here) on the BitMEX platform were approved, made, placed, or authorized by employees located in the United States.

42. On July 13, 2022, Celsius Network LLC and certain of its affiliates commenced voluntary cases under Chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York, *In re Celsius Network LLC, et al.* (Case No. 22-10964 (MEW)) (Bankr. S.D.N.Y.).[16]

43. On November 9, 2023, the Bankruptcy Court entered an order in the Chapter 11 Cases confirming the Plan.

44. The Plan expressly preserved the Debtors' Causes of Action for prosecution following the Effective Date. Article IV.S provides that each Post-Effective Date Debtor shall retain, and any Litigation Administrator with respect to Recovery Causes of Action may enforce, "all rights to commence and pursue, as appropriate, any and all Causes of Action," whether arising before or after the Petition Date, including "any actions specifically enumerated in the Schedule of Retained Causes of Action." The Plan further provides that the Litigation Administrators' rights to "commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date."

45. BRIC brings this action on behalf of Celsius to prosecute the claims arising from the Liquidations. Those claims arose before the Chapter 11 Cases, were expressly preserved for post-confirmation prosecution under the Plan and are among the retained causes of action now administered by BRIC.

46. This action therefore bears a close nexus to the implementation and administration of the Plan. The Plan specifically preserved the claims against BitMEX for post-confirmation prosecution through the litigation-administration structure established under it, and any recovery

---

[16] *See Findings of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan*, at 1–2 (recital a) [ECF Doc. No. 3972].

obtained through this action will be administered pursuant to the Plan and related agreements for the benefit of the applicable Claim Holders.

## II. BACKGROUND ON BITMEX AND ITS CORPORATE STRUCTURE

47. BitMEX, short for the "Bitcoin Mercantile Exchange," is a cryptocurrency derivatives trading platform founded in 2014 by Hayes, Delo, and Reed.[17] Through BitMEX, customers traded futures, options, swaps, and other derivatives tied to cryptocurrencies, including BTC. Unlike a spot exchange, where customers purchase or sell the underlying assets, BitMEX offered derivatives whose value was tied to cryptocurrency without requiring customers to purchase those underlying assets.[18]

48. BitMEX grew rapidly—by 2020 trillions of dollars in derivatives contracts had traded on the platform, generating more than $1 billion in fees.[19] BitMEX permitted customers to trade with leverage as high as 100-to-1.[20] Customers posted BTC as margin to support their positions, allowing them to obtain exposure substantially greater than the amount of BTC committed as collateral.[21]

---

17 *See* BitMEX, *A Decade of BitMEX: Honouring Our Bitcoin OG Legacy* (Nov. 23, 2024), available at: https://www.bitmex.com/blog/decade-of-bitmex.

18 *See* BitMEX, *Why XBTUSD is a Superior Trading Product* (May 13, 2016), available at: https://www.bitmex.com/blog/why-xbtusd-is-a-superior-trading-product; *see also Commodity Futures Trading Comm'n v. HDR Global Trading Ltd.*, No. 20-cv-8132 (MKV) (S.D.N.Y. Aug. 10, 2021), *Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief Against Defendants HDR Global Trading Limited, 100x Holdings Limited, Shine Effort Inc Limited, and HDR Global Services (Bermuda) Limited*, ¶¶ 21–24, 29 (the "CFTC Consent Order").

19 *See Commodity Futures Trading Comm'n v. HDR Global Trading Ltd.*, No. 20-cv-8132 (MKV), Compl. ¶ 3 (S.D.N.Y. Oct. 1, 2020) (the "CFTC Compl."). The CFTC alleged trillions of dollars of transactions and more than $1 billion in fees. FinCEN later independently determined that BitMEX generated at least $1 billion in fees on trillions of dollars' worth of trades during the relevant period. *See* FinCEN Assessment at 30.

20 *See* BitMEX, *XBTUSD 100x is Live!* (May 13, 2016), available at: https://www.bitmex.com/blog/site-announcement/2432. The CFTC also publicly stated when it filed the action that BitMEX permitted leverage of up to 100-to-1. *See* Press Release, Commodity Futures Trading Commission, *CFTC Charges BitMEX Owners with Illegally Operating a Cryptocurrency Derivatives Trading Platform and Anti-Money Laundering Violations*, No. 8270-20 (Oct. 1, 2020), available at: https://www.cftc.gov/PressRoom/PressReleases/8270-20.

21 *See* CFTC Consent Order ¶ 29.

49. Functionally, BitMEX operated through a network of related corporate entities. HDR, incorporated in the Seychelles in 2014, owned and operated the BitMEX platform. Hayes, Delo, and Reed each owned approximately one-third of HDR.[22] But HDR had no employees or operations in the Seychelles.[23] Instead, BitMEX conducted its business through offices and affiliated entities located throughout the world, including substantial operations in the United States, including New York City. Those affiliated entities likewise performed different functions for the exchange, all sharing common ownership and management, and holding themselves out collectively as "BitMEX."

50. One of those affiliates was ABS, a Delaware corporation formed by Hayes, Delo, and Reed in 2017. ABS conducted substantial portions of BitMEX's U.S. operations and was responsible for technical and operational aspects of the platform, including security and the interface through which customers placed trades.[24]

51. Another affiliate, Shine, conducted BitMEX's proprietary trading, including trading on the BitMEX platform itself.[25] BitMEX itself publicly acknowledged during the relevant period that, in addition to operating the trading platform, an affiliated entity conducted a for-profit trading business that bought and sold products listed on BitMEX and traded principally as a market maker.[26]

---

22 *See id.* ¶ 16.
23 *See* CFTC Compl. ¶ 10.
24 *See id.* ¶¶ 53, 55.
25 *See* CFTC Consent Order ¶ 19.
26 *See* BitMEX, *BitMEX Market Making Desk* (archived May 01, 2018), available at: https://web.archive.org/web/20180501000000/https://blog.bitmex.com/bitmex-market-making-desk/.

52. HDR Bermuda employed additional BitMEX personnel who performed services for BitMEX.[27] And 100x Group later became the holding company for HDR and the BitMEX platform.[28]

53. These entities operated as a coordinated BitMEX enterprise. In August 2021, the United States District Court for the Southern District of New York entered the CFTC Consent Order finding that BitMEX operated as a common enterprise through HDR, ABS, Shine, HDR Bermuda, and, beginning in July 2020, 100x Group.[29] FinCEN separately determined that HDR, 100x Group, ABS, Shine, and HDR Bermuda operated and did business as a "single, common, integrated enterprise, BitMEX."[30] The entities shared ownership, directors, employees, office space, operational resources, legal and compliance personnel, and expenses; reported financial activity through consolidated financial statements; and operated through a common website and "bitmex.com" email addresses.[31]

54. Control over that enterprise was concentrated in its three founders. Hayes, Delo, and Reed controlled BitMEX's bank and trading accounts, personnel, deposits and withdrawals, and key financial and trading decisions.[32] Their responsibilities extended to the design and operation of the trading platform itself: Delo oversaw the trading engine; Reed designed and oversaw BitMEX's website, API, and order-entry system; and Hayes directed strategy, business development, marketing, and management.[33] The founders also decided how BitMEX's

---

[27] *See* CFTC Consent Order ¶ 20.
[28] *See* BitMEX, *Introducing the 100x Group* (July 14, 2020), available at: https://www.bitmex.com/blog/introducing-the-100x-group.
[29] *See* CFTC Consent Order ¶ 22.
[30] *See* FinCEN Assessment at 5.
[31] *See* CFTC Compl. ¶ 15.
[32] *See id.* ¶¶ 63–64.
[33] *Id.* ¶ 69.

derivatives would be structured and participated in developing and managing its internal market-making algorithms.[34]

**A. BitMEX's Extensive Connections To The United States**

55. Although HDR was incorporated in the Seychelles, substantial portions of BitMEX's business were operated from the United States. During the relevant period, approximately half of BitMEX's workforce was located in the United States, including at least nine employees in New York and 56 in San Francisco.[35] Under an April 2017 services agreement between HDR and ABS, U.S.-based ABS personnel performed functions for BitMEX including business development, marketing, sales, engineering, customer support, and software development.[36]

56. The U.S. operations included functions central to the exchange. Personnel in San Francisco performed product engineering, incident response, software and security engineering, product management, user-interface design, data engineering, web development, security, and information-technology functions.[37] BitMEX used vendors based in the United States for critical components of its business, for example using Google products, Slack, and Amazon Web Services.[38] Reed, one of BitMEX's founders and a principal architect, worked primarily from the United States.[39] And BitMEX maintained an office in Manhattan from which personnel conducted business development, customer support, institutional sales, product development, marketing, and other operations.[40]

---

34 *Id.* ¶ 72.
35 *Id.* ¶ 52.
36 *Id.* ¶ 53.
37 *Id.* ¶ 55.
38 *See* CFTC Consent Order, ¶ 61.
39 *See* CFTC Compl. ¶ 56.
40 *See Hayes* Indictment ¶ 33(a); *see also* CFTC Consent Order, ¶ 25.

57. BitMEX also conducted substantial business with U.S. customers. During the period preceding October 2020, BitMEX operated its trading platform in large part from the United States, transacted with thousands of U.S. persons, and accepted more than $11 billion in BTC deposits from at least 85,000 user accounts with a U.S. nexus.[41] Internal BitMEX records reflected thousands of trading-enabled accounts with U.S. location information.[42]

58. BitMEX's founders and senior personnel knew that U.S. customers continued to trade on the platform notwithstanding BitMEX's purported prohibition on U.S. users. Hayes and Delo admitted when pleading guilty to violations of the Bank Secrecy Act that BitMEX continued to serve U.S. customers, and that BitMEX's purported withdrawal from the U.S. market did not prevent U.S. customers from accessing and trading on the platform.[43] Reed likewise pleaded guilty and admitted that, despite BitMEX's policy barring U.S. users, he understood that U.S. users continued to access the platform.[44] Dwyer, BitMEX's Head of Business Development, subsequently pleaded guilty to the same offense; the Department of Justice reported that Dwyer knew BitMEX's purported withdrawal from the United States was ineffective and that he collected and circulated data reflecting U.S. trading and revenue.[45]

59. Internal information confirmed the significance of the U.S. market to BitMEX. In July 2017—nearly two years after BitMEX purported to prohibit U.S. users—Dwyer circulated a report to BitMEX's founders stating that the "United States remains the most popular country by

---

41 *See* CFTC Compl. ¶ 3; *see also* Ian McGinley, Director of Enforcement, Commodity Futures Trading Commission, *Enforcement by Enforcement: The CFTC's Actions in the Derivatives Markets for Digital Assets* (Sept. 11, 2023), available at: https://www.cftc.gov/PressRoom/SpeechesTestimony/opamcginley1#fntref12.

42 *See United States v. Reed*, No. 20-cr-500 (JGK), 2022 WL 597180, at *2 (S.D.N.Y. Feb. 28, 2022) (quoting Indictment ¶ 17).

43 *See* Press Release, U.S. Att'y's Off., S.D.N.Y., *Founders of Cryptocurrency Exchange Plead Guilty to Bank Secrecy Act Violations*.

44 *See* Press Release, U.S. Att'y's Off., S.D.N.Y., *Third Founder of Cryptocurrency Exchange Pleads Guilty to Bank Secrecy Act Violations*.

45 *See* Press Release, U.S. Att'y's Off., S.D.N.Y., *High-Ranking Employee at Cryptocurrency Exchange Pleads Guilty to Bank Secrecy Act Violations*.

visits and average number of active users per day."[46] Subsequent monthly revenue reports continued to identify U.S. users on BitMEX.[47]

60. BitMEX also marketed to U.S. customers. Hayes promoted BitMEX through appearances on U.S. media outlets and through BitMEX's affiliate program.[48] By July 2018, at least 1,100 U.S. participants in that program had received affiliate payments from BitMEX for soliciting customers to trade on the platform.[49] In 2019 alone, BitMEX paid approximately $66 million in affiliate commissions.[50]

61. The civil and criminal proceedings described above further confirmed the extent of BitMEX's U.S. operations. The CFTC Consent Order found that BitMEX maintained offices in the United States, including in New York, solicited orders from U.S.-based customers, and offered leveraged cryptocurrency derivatives to retail and institutional customers in the United States.[51]

62. BitMEX itself later admitted the substantial U.S. nexus of its operations. In July 2024, HDR pleaded guilty to willfully violating the Bank Secrecy Act by failing to establish, implement, and maintain an adequate anti-money-laundering program.[52] In connection with that plea, the Department of Justice stated that BitMEX had "long serviced and solicited business from U.S. traders" and "operated through U.S. offices," and that BitMEX and its executives knew that the company was required to comply with U.S. law because of its U.S. operations and customers.[53]

---

46 *See Hayes*, No. 1:20-cr-00500-JGK, Gov't Sentencing Mem., ECF No. 334, at 4 (S.D.N.Y. May 12, 2022) (quoting Presentence Investigation Report ("PSR") ¶ 21), available at: https://www.moneylaunderingnews.com/wp-content/uploads/sites/12/2022/05/Gov-Sentencing-Memo.pdf.

47 *Id*. (citing PSR ¶ 22.)

48 *Id.* at 3–4 (citing PSR ¶¶ 33–35).

49 *See* CFTC Compl. ¶ 78.

50 *See id*.

51 *See* CFTC Consent Order ¶¶ 23–25, 29.

52 *See* Press Release, U.S. Att'y's Off., S.D.N.Y., *Global Cryptocurrency Exchange BitMEX Pleads Guilty to Bank Secrecy Act Offense*; *see also* U.S Att'y's Off., S.D.N.Y., *Global Cryptocurrency Exchange BitMEX Fined $100 Million for Violating Bank Secrecy Act* (Jan. 15, 2025), available at: https://www.justice.gov/usao-sdny/pr/global-cryptocurrency-exchange-bitmex-fined-100-million-violating-bank-secrecy-act.

53 *See id*.

63. BitMEX therefore was not simply an offshore exchange that happened to be accessible from the United States. Its founders and senior personnel operated substantial portions of the business from this country; its U.S. offices performed functions integral to the operation of the trading platform; it conducted substantial business with U.S. customers; and it affirmatively cultivated the U.S. market.

**B. BitMEX's XBTM20 Product**

64. BitMEX's business centered on cryptocurrency derivatives, including futures contracts tied to the price of BTC. BitMEX referred to BTC as "XBT" and offered a series of XBT-denominated derivatives. Relevant here is "XBTM20," a BTC/U.S. Dollar futures contract that BitMEX listed for trading on December 13, 2019, and scheduled to settle on June 26, 2020.[54] The positions held by Celsius and JST that are the subject of this action were positions in XBTM20.

65. The XBTM20 futures contract allowed a customer to take a position on the future price of BTC without purchasing the corresponding amount of BTC. Unlike BitMEX's perpetual contracts, which had no scheduled expiration, XBTM20 had a fixed settlement date. If a customer maintained an XBTM20 position through June 26, 2020, the position would settle at BitMEX's designated settlement price, the position would close, and the resulting profit or loss would be credited or debited to the customer's BTC balance.[55]

66. The XBTM20 contract was derived from the underlying BTC spot-price index ("BXBT") together with a futures-basis adjustment calculated from BitMEX's own order book,

---

[54] *See* BitMEX, *Q1 2020 Quarterly Futures Listings* (archived Dec. 11, 2019) (identifying XBTM20 as a Bitcoin/U.S. Dollar contract listed December 13, 2019 with a June 26, 2020 settlement date), available at: https://web.archive.org/web/20191211160339/https://blog.bitmex.com/.

[55] *See* BitMEX, *Futures Guide* (archived Dec. 12, 2019) (explaining that BitMEX futures are cash-settled, have specified expiration dates, and that settlement closes the position at the settlement price), available at: https://www.bitmex.com/app/futuresGuide; *see also* BitMEX, *Exchange Guide*, available at: https://www.bitmex.com/app/exchangeGuide and https://web.archive.org/web/20191117174221/https://www.bitmex.com/app/exchangeGuide.

including the contract's bid and ask prices. This futures-basis adjustment reflected whether the XBTM20 futures contract was trading at a premium or discount to the underlying BTC market. BitMEX used these inputs through a system called "Fair Price Marking" to calculate the contract's "Fair Price." The Fair Price, in turn, served as the "Mark Price" that BitMEX used to value open positions and determine whether they remained sufficiently collateralized or subject to liquidation.[56]

67. Customers did not have to deposit BTC equal to the full notional value of an XBTM20 position. Instead, BitMEX permitted customers to trade on margin, using BTC deposited with BitMEX as collateral. The amount required to open a position was the "Initial Margin." Once the position was open, the customer was required to maintain a lesser amount of collateral—the Maintenance Margin Requirement ("MMR")—to keep the position open.[57] This structure permitted customers to obtain exposure to positions substantially larger than the amount of BTC they had deposited as collateral.

68. The value of an open position, and whether it remained adequately collateralized, changed as the market moved. BitMEX did not use the last price at which the contract traded to determine whether a position should be liquidated. Instead, it calculated a "Mark Price," which in turn was used to calculate unrealized profit and loss and to determine whether a position had sufficient margin to remain open.[58] The Mark Price was the same for every user.

69. So long as the margin supporting a position remained above BitMEX's designated MMR for a specific customer, the customer could maintain the position notwithstanding

---

[56] *See* BitMEX, *Fair Market Pricing* (archived Nov. 17, 2019), available at: https://web.archive.org/web/20191117143353/https://www.bitmex.com/app/fairPriceMarking (hereinafter "BitMEX Fair Market Pricing").

[57] *See* BitMEX, *FAQ* (archived Mar. 9, 2020), available at: https://web.archive.org/web/20200309043114/https://www.bitmex.com/app/faq.

[58] *See* BitMEX, Futures Guide (archived Dec. 9, 2019), available at: https://web.archive.org/web/20191209190509/https://www.bitmex.com/app/futuresGuide.

fluctuations in the market price. In other words, if the Mark Price fell to the MMR, in certain circumstances BitMEX could attempt initiate liquidation procedures. A customer whose contract approached its MMR could protect their position by, among other things, depositing or allocating additional BTC as collateral.[59] Additional collateral increased MMR, allowing the customer to withstand a further adverse movement in the Mark Price without a liquidation.[60]

### C. BitMEX's Liquidation Engine And Insurance Fund

70. BitMEX employed a liquidation system that allowed it to take control of customer positions before the collateral supporting those positions was exhausted (*i.e.*, before the price reached the Bankruptcy Price). If the Mark Price moved against a customer's position such that the customer's margin fell below the applicable MMR, the position became subject to liquidation and could be taken over by BitMEX's Liquidation Engine.[61]

71. Critically, a position became subject to liquidation before it had exhausted all of the customer's collateral. BitMEX distinguished between a position's "Liquidation Price," at which the position had only the MMR remaining, and its Bankruptcy Price, at which the position had zero equity and all posted margin had been depleted.[62] Thus, when BitMEX's Liquidation Engine took control of a position at the Liquidation Price, customer equity remained in the position.

---

59 *See* BitMEX, Liquidation (archived Nov. 11, 2019) (hereinafter "BitMEX Liquidation") (explaining that a trader could adjust the liquidation price by adding additional margin), available at: https://web.archive.org/web/20191117161509/https://www.bitmex.com/app/liquidation.

60 *See* BitMEX, *Isolated and Cross Margin* (archived Sep. 20, 2019) (explaining that margin assigned to a position could be adjusted and that the position's liquidation price changed as margin was adjusted), available at: https://web.archive.org/web/20190920075648/https://www.bitmex.com/app/isolatedMargin.

61 *See* BitMEX, *BitMEX Insurance Fund: Your Questions Answered* (archived Mar. 31, 2020) (hereinafter "Insurance Fund FAQ") ("When the Mark Price breaches the Liquidation Price, the trader's position is liquidated and their Maintenance Margin is taken over by BitMEX's Liquidation Engine."), available at: https://web.archive.org/web/20200331182252/http://blog.bitmex.com/bitmex-insurance-fund-your-questions-answered/.

62 *Id.* (defining the "Bankruptcy Price" as the price at which "all posted margin has been depleted" and the "Liquidation Price" as the price at which "only Maintenance Margin remains").

72. While BitMEX alleged that the MMR was set higher than the Bankruptcy Price to ensure positions could be liquidated at a price sufficient to pay off the contract, BitMEX would send to the Insurance Fund any sum obtained from closing the position above the Bankruptcy Price. The losing trader received nothing—all of the collateral was liquidated and any benefit or profit inured to the Insurance Fund.

73. While BitMEX has represented that the Insurance Fund is for the benefit of customers, BitMEX has asserted that assets not paid out of the Insurance Fund belong to BitMEX.[63]

74. BitMEX retained that liquidation profit rather than returning it to the liquidated customer. BitMEX's own description of the Liquidation Engine illustrates the mechanism. In BitMEX's example, after taking over a customer's position, the Liquidation Engine assumed the position at a Bankruptcy Price of $5,940. If the Liquidation Engine then closed the position at $5,955, it made a $15-per-contract profit. BitMEX explained that "that profit is added to the Insurance Fund," where it remained available to fund future liquidations.[64] The liquidated customer received none of that profit.

75. The Insurance Fund thus accumulated, among other amounts, profits generated when BitMEX's Liquidation Engine closed customer positions at prices better than their Bankruptcy Prices. BitMEX described the Insurance Fund as the margin available to the Liquidation Engine to close positions acquired through liquidations and as a "last line of defence" against the auto-deleveraging of profitable traders.[65] When the Liquidation Engine incurred losses

---

[63] *See* Bloomberg, *What Happens to BitMEX's 3 Billion Fund Once the Exchange Sunsets* (Aug. 4, 2026), available at: https://www.bloomberg.com/news/newsletters/2026-08-04/what-happens-to-bitmex-s-3-billion-fund-once-the-exchange-sunsets.

[64] *Id.* (providing an example in which the Liquidation Engine assumes a liquidated position at a Bankruptcy Price of $5,940, closes it at $5,955, makes $15 per contract, and explaining that "that profit is added to the Insurance Fund").

[65] *Id.*

closing liquidated positions, it could draw upon the Insurance Fund; when it closed positions at a profit, those profits increased the Fund.

76. BitMEX publicly reported the balance of its Insurance Fund. By March 2020, the Fund had accumulated tens of thousands of XBT.[66] And BitMEX's own account of the events of March 12 and 13, 2020 (as described below) demonstrates the magnitude of the profits that its Liquidation Engine could generate. During the extreme market movements on those dates, BitMEX reported that the Liquidation Engine exited certain liquidated positions above its average entry price, causing the Insurance Fund to *increase* by 4,457 XBT. The total Insurance Fund reached an intraday peak of 37,836 XBT.[67]

77. This stands in stark contrast to the insurance funds operated by other major derivative exchanges. For example, the insurance fund operated by Deribit experienced a *dramatic decline* in deposits and required an injection of 500 BTC of the company's own assets.[68] This fact is telling of how BitMEX's procedures acted as compared to other exchanges in the market.

78. BitMEX's liquidation system therefore gave BitMEX an economic interest in the liquidation of customer positions. A customer whose position remained above the MMR retained control of the position and the equity supporting it. Once the Mark Price went below the MMR, BitMEX liquidated the position, however, the customer lost their entire equity, and any profit generated by BitMEX's ability to close the position above its Bankruptcy Price was retained in BitMEX's Insurance Fund rather than returned to the customer.

---

[66] *Id.* (reporting an Insurance Fund balance of approximately 34,678 XBT as of March 19, 2020).

[67] *Id.* (reporting that, during the events of March 12 and 13, 2020, the Liquidation Engine's exits above its average entry price caused the Insurance Fund to grow by 4,457 XBT and reach a peak balance of 37,836 XBT).

[68] *See* Yahoo, *Derivatives market liquidations push BitMEX's insurance fund to all-time high, cut Deribit's by almost half* (Mar. 13, 2020), available at: https://finance.yahoo.com/news/derivatives-market-liquidations-push-bitmex-203931973.html.

## III. BITMEX'S REPRESENTATIONS AND TERMS OF SERVICE

### A. The Representations

79. BitMEX represented that it used Fair Price Marking "to avoid unnecessary liquidations" that otherwise could result where the market "is being manipulated, is illiquid, or the Mark Price swings unnecessarily relative to its Index Price."[69] BitMEX further represented that "the system is able to achieve this" by using the Fair Price rather than the Last Price for that protective reason.[70] Customers were assured that this "makes BitMEX markets much more difficult to manipulate by referencing external liquidity."[71] In connection with its liquidation procedures, BitMEX also represented that it "uses Fair Price Marking for the purpose of avoiding liquidation due to illiquid markets or manipulation."[72] BitMEX stated that because Fair Price Marking used external spot-exchange indices rather than BitMEX's Last Price, making BitMEX markets "much more difficult to manipulate."[73] Collectively, these representations are hereafter referred to as the "Fair Price Representations."

80. BitMEX further represented that "When one trades on a derivatives trading platform such as BitMEX, one does not trade against the platform. BitMEX is merely a facilitator for the exchange of derivatives contracts between third parties."[74] It stated, "rest assured…[that]

---

69 *See* BitMEX Fair Market Pricing.
70 *See id.*
71 *See* BitMEX, *BitMEX Technology Scaling, Part 2: The Road to 100x* (archived Jun. 15, 2019), available at: https://web.archive.org/web/20190615035509/https://blog.bitmex.com/bitmex-technology-scaling-part-2-the-road-to-100x/.
72 *See* BitMEX Liquidation.
73 *See* BitMEX Fair Market Pricing.
74 *See* BitMEX, *The BitMEX Insurance Fund* (archived Apr. 4, 2019) (hereinafter "BitMEX Insurance Fund"), available at: https://web.archive.org/web/20190404180056/https://blog.bitmex.com/the-bitmex-insurance-fund/.

settlements are honest, and all participants enjoy the same access and opportunity."[75] Collectively, these representations are hereafter referred to as the "Fair Trading Representations."

81. BitMEX represented that they "won't sacrifice safety for speed. The security of our users' funds and confidence in their trades is paramount. But we hear all of you: you want to trade faster, you want freedom from 'System Overload' messages, and we will give that to you."[76] And in a blog post written by Reed, he described the security of users' funds and confidence in their trades as "paramount."[77] Collectively, these are the "System Access Representations."

82. BitMEX also made several representations regarding the function and purpose of the Insurance Fund. BitMEX represented that the Insurance Fund existed "to help ensure winners receive their expected profits" while limiting losing traders' downside, and that the growth of the Insurance Fund provided a "reasonable level of assurance" that winning traders would obtain their expected profits.[78] Collectively, these representations are referred to as the "Insurance Fund Representations," and together with the Fair Price Representations, Fair Trading Representations, and the System Access Representations, the "Representations."

83. BitMEX made the Representations knowing they were false or with reckless disregard for the truth. Celsius and JST did not know the Representations were false and justifiably relied on them when they decided to onboard and trade on the BitMEX platform.

[75] *See* BitMEX, *Ensuring the Continued Compliance of the BitMEX Platform, 19 August 2019* (archived Aug. 21, 2019), available at: https://web.archive.org/web/20190821013113/https://blog.bitmex.com/ensuring-the-continued-compliance-of-the-bitmex-platform-19-august-2019/.

[76] *See* BitMEX, *BitMEX Technology Scaling: Part 1* (archived May 4, 2018), available at: https://web.archive.org/web/20180504180912/https://blog.bitmex.com/bitmex-technology-scaling-part-1/.

[77] *See id.*

[78] *See* BitMEX Insurance Fund.

### B. The Terms of Service

84. At the time of the Liquidations, Celsius's and JST's use of BitMEX was governed by the Terms of Service in effect in March 2020 (the "TOS").[79]

85. The TOS sets forth BitMEX's rights to manage customer positions and collateral, execute liquidations, and operate the Trading Platform (as that term is defined in the TOS). Among other things, BitMEX claimed to have the right to freeze accounts, unwind trades, and halt trading.[80] All of these rights were subject to BitMEX's obligations to maintain an orderly market on its platform, to deal fairly with its customers, and to act in good faith.

86. BitMEX expressly promised and acknowledged, among other things, that it was "[BitMEX's] responsibility to maintain an orderly market."[81]

87. The TOS also expressly authorized BitMEX to halt trading in response to "market disruption or other relevant external events."[82] BitMEX thus possessed both the responsibility to maintain an orderly market and the power to respond to market conditions and disruptions.

## IV. BITMEX'S FRAUDULENT SCHEME

88. Despite its Representations and the provisions of the TOS, BitMEX intentionally designed its derivatives pricing and liquidation procedures to defraud its customers by generating market disorder and fuelling liquidation events, especially in times of high market volatility. BitMEX accomplished this using at least three methods.

89. *First*, upon liquidation, BitMEX would sell a customer's BTC collateral on the BitMEX platform itself. Because the Mark Price of derivative products was directly influenced

---

79 The TOS is attached as **Exhibit A**. *See* BitMEX, *Terms of Service* (archived Mar. 7, 2020), available at: https://web.archive.org/web/20200307112344/https://www.bitmex.com/app/terms.

80 *See id.* §§ 1.8, 1.10, 1.12.

81 *See id.* §§ 1.12, 7.3.

82 *See id.* § 1.12.

by the BTC spot price on the BitMEX platform, BitMEX's selling activity often generated downward sell pressure on the Mark Price. As the Mark Price fell, more liquidations would occur, generating further downward pressure, and so on.

90. *Second*, BitMEX would create "sell walls" by selling liquidated BTC collateral in huge blocks, especially where the market was trending downward. Specifically, when executing liquidations, BitMEX would often set the "best ask" price, which represents the lowest price at which a market participant is willing to sell BTC at a given moment. Collectively, ask orders form the available sell-side liquidity in the order book. As such, by creating large concentrations of ask liquidity, BitMEX would create significant resistance to upward price movement that had the effect of impeding recovery by requiring buyers to absorb substantial resting sell interest before prices can rise. This, in turn, can increase liquidations and increase the Insurance Fund that BitMEX itself controls.

91. For example, if Bitcoin is trading at $4,200 and the order book contains a relatively small amount of sell interest between $4,200 and $4,250, a modest amount of buying can move the market upward. In contrast, if an unusually large sell order is resting at $4,010, buyers must first purchase that entire quantity at that price before the market can advance beyond that level. Market participants often refer to such concentrations of sell liquidity as a "sell wall."

92. *Third*, upon information and belief, BitMEX would enter sell orders far below the prevailing market price of BTC on the BitMEX exchange to drive prices downward and fuel additional liquidations—which would increase the value of the Insurance Fund that BitMEX controls. Notably, the bid/ask price affected the calculation of the Mark Price of XBTM20, not just completed trades. For example, according to best asks/best bids trading data, at 02:50 UTC on March 13, 2020, the best ask for XBTM20 fell dramatically from 4,502 to 3,422 USD/XBT:

| timestamp_jsh | symbol | bid_size | bid_price | Est Mark Price | ask_price | ask_size |
|---|---|---|---|---|---|---|
| 3/13/2020 2:50 | XBTM20 | 6,807 | 4,479.50 | 4,490.75 | 4,502.00 | 1,080 |
| 3/13/2020 2:50 | XBTM20 | 8,556 | 4,479.50 | 4,490.75 | 4,502.00 | 1,080 |
| 3/13/2020 2:50 | XBTM20 | 10,390 | 4,479.50 | 4,490.75 | 4,502.00 | 1,080 |
| 3/13/2020 2:50 | XBTM20 | 12,191 | 4,479.50 | 4,490.75 | 4,502.00 | 1,080 |
| 3/13/2020 2:50 | XBTM20 | 13,550 | 4,479.50 | 4,490.75 | 4,502.00 | 1,080 |
| 3/13/2020 2:50 | XBTM20 | 2,001 | 3,405.50 | 3,413.75 | 3,422.00 | 9,492,472 |
| 3/13/2020 2:50 | XBTM20 | 1 | 3,405.50 | 3,413.75 | 3,422.00 | 9,492,472 |
| 3/13/2020 2:50 | XBTM20 | 110,089 | 3,400.00 | 3,411.00 | 3,422.00 | 9,492,472 |
| 3/13/2020 2:50 | XBTM20 | 108,883 | 3,400.00 | 3,411.00 | 3,422.00 | 9,492,472 |
| 3/13/2020 2:50 | XBTM20 | 108,883 | 3,400.00 | 3,411.00 | 3,422.00 | 9,490,472 |

93. This 1,080 USD/XBT drop in the immediate best ask price cannot be rationally explained, caused a substantial decline in the Mark Price, and is even more relevant here given that the ***JST Liquidation occurred at 02:50:28 UTC on March 13, 2020, at the same Mark Price of 3,422 USD/XBT***.

94. Upon information and belief, this sell order was placed by BitMEX traders liquidating JST's position.

95. Using at least the methods set forth above, BitMEX's pricing and liquidation procedures were designed intentionally, or with reckless disregard, to fuel, rather than restrain, the disorder in the market it had expressly assumed responsibility for maintaining contrary to the Representations.[83]

## V. THE EVENTS OF MARCH 12 AND MARCH 13, 2020

96. BitMEX's ability to influence its own derivatives prices was particularly significant because trading information from the BitMEX platform itself was a major factor in determining the Mark Price that determined whether a customer's position was liquidated.

83 *See id.* §§ 1.10, 1.12.

97. By March 2020, BitMEX handled billions of dollars in trading volume each day, and price movements on BitMEX's platform directly influenced prices on other major BTC spot exchanges.[84]

98. That influence was especially pronounced during periods of high price volatility, and particularly during market declines. BitMEX derivatives had positive price spillover effects on major BTC spot markets, and trades on BitMEX tended to lead spot prices when the market was falling.[85] Thus, movements generated on the BitMEX platform affected the very spot markets used to value BitMEX's derivatives and determine when customer positions became subject to liquidation.

99. That dynamic became critical starting on March 12, 2020. BTC started the day at approximately $8,000 and fell approximately 50% that same day, one of the largest one-day declines in its history.[86] Trading activity on BitMEX was enormous. Approximately $12.3 billion in derivatives traded on BitMEX on March 12 alone, nearly one quarter of the approximately $53 billion in cryptocurrency-derivatives volume measured across the market that day.[87] As BTC prices fell, leveraged long positions on BitMEX began to reach and exceed their liquidation thresholds. BitMEX's Liquidation Engine then took control of those positions and closed them into the declining market.

---

[84] *See* Carol Alexander et al., *BitMEX Bitcoin Derivatives: Price Discovery, Informational Efficiency, and Hedging Effectiveness*, 40 J. Futures Mkts. 23, 24–43 (2020) (finding that BitMEX derivatives "lead prices on major bitcoin spot exchanges").

[85] *See id.* (finding that BitMEX derivatives had "positive net spillover effects" on major BTC spot markets and concluding that "trades on BitMEX lead the spot prices when the market is down").

[86] *See* Coinbase, *Around the Block #4: On the Recent Market Crash and Bitcoin's Value Proposition* (Mar. 30, 2020) (hereinafter "Coinbase Around the Block #4") (reporting that BTC declined approximately 50% on March 12, "marking the single largest one-day drop in Bitcoin's price since 2013"), available at: https://www.coinbase.com/blog/on-crypto-markets-and-bitcoins-value-proposition.

[87] *See* CryptoCompare, *Exchange Review—March 2020*, at 14 (Mar. 2020) (reporting approximately $53 billion in cryptocurrency-derivatives volume on March 12, including approximately $12.3 billion on BitMEX), available at: https://www.cryptocompare.com/media/36934956/cryptocompare_exchange_review_2020_03.pdf.

100. Each round of liquidations increased the selling pressure on BitMEX's own derivatives, including XBTM20. Lower prices caused additional customer positions to become subject to liquidation, which gave the Liquidation Engine still more positions to sell. Between approximately 09:00 UTC on March 12 and 06:00 UTC on March 13, approximately 1.1 billion long contracts were liquidated on BitMEX.[88]

101. The Liquidation Engine itself became a major source of selling. BitMEX later acknowledged that the volume of liquidations left the Liquidation Engine with a "large aggregated long position" to exit and that, as the position grew, its algorithm sold into the market at progressively lower prices.[89]

102. The result was a self-reinforcing liquidation cascade: falling prices triggered BitMEX liquidations; those liquidations generated additional selling; the additional selling pushed prices lower; and the lower prices triggered still more liquidations.[90] There is evidence of significant market dislocation on BitMEX during March 12-13, 2020, including extreme futures-index divergence, widening spreads, unstable liquidity conditions, and elevated volatility.

103. The dislocation proceeded to deteriorate throughout the relevant time period, which resulted in sustained and extreme futures-index dislocations. For example, basis discounts reaching approximately 39%, spread expansion exceeding 7%, rolling volatility approaching 49%,

---

[88] *See* Coin Metrics, *State of the Network: Issue 43—The BitMEX Liquidation Spiral* (Mar. 24, 2020) (hereinafter "Coin Metrics, State of the Network") (reporting approximately 1.1 billion long contracts liquidated between 09:00 UTC on March 12 and 06:00 UTC on March 13), available at: https://coinmetrics.substack.com/p/coin-metrics-state-of-the-network-bf8.

[89] *See* BitMEX Insurance Fund FAQ (acknowledging that the volume of liquidations on March 12 and 13 gave the Liquidation Engine a "large aggregated long position in XBTUSD to exit" and that its algorithm unwound that position at prices that became "gradually more aggressive (lower)" as the position grew).

[90] *See* Coin Metrics, State of the Network (explaining that as liquidations mounted, BitMEX's Liquidation Engine had increasing quantities of contracts to sell into a worsening market, creating a "vicious cycle" of lower prices and further liquidations).

and there were prolonged periods during which XBTM20 traded at significant discounts to the weighted BTC index.

104. Because BitMEX prices influenced major BTC spot exchanges, the effects of that selling were not confined to BitMEX. Downward price pressure originating on BitMEX transmitted to the spot market on other major exchanges, which in turn affected the prices index used by BitMEX to value its own contracts and determine whether customer positions would be liquidated.

105. During the relevant time period here, the distortion in the BTC market on BitMEX became extreme. During the selloff, BTC traded on BitMEX materially below prices on other exchanges, and the cascading liquidations were most pronounced on BitMEX.[91]

106. The cascade continued until access to the BitMEX platform was itself disrupted. Starting on March 13 at approximately 02:16 UTC and lasting until 02:40 UTC, BitMEX experienced an alleged distributed denial-of-service attack (the "Outage"), which made it nearly impossible for customers to reach BitMEX's trading engine.[92] The Outage effectively caused the cascading liquidations to pause, and BTC prices promptly rebounded.[93]

107. The timing was telling. Immediately before the disruption, BTC was trading on BitMEX at a spot price of approximately $3,900. Once trading on BitMEX became severely impaired, the spot BTC price almost immediately recovered to approximately $5,300.[94]

---

91 *See* Coinbase Around the Block #4 ("Cascading liquidations were most prominent on BitMEX" and, during the selloff, BTC on BitMEX traded "well below that of other exchanges").

92 *See* Arthur Hayes, *How We Are Responding to Last Week's DDoS Attacks* (archived Mar. 17, 2020) (acknowledging that the attack began at approximately 02:16 UTC, delayed or prevented customer requests, and made it "nearly impossible to reach the engine"), available at: https://web.archive.org/web/20200319183454/https://blog.bitmex.com/how-we-are-responding-to-last-weeks-ddos-attacks/.

93 *See* Coinbase Around the Block #4 ("It wasn't until BitMEX went down for maintenance at peak volatility . . . that the cascading liquidations were paused, and the price promptly rebounded.").

94 *See* Coin Metrics, State of the Network (reporting that BTC had fallen to approximately $3,900 immediately before the BitMEX disruption and that, once BitMEX was attacked, BTC "recovered and surged to $5,300").

108. Celsius and JST became victims of BitMEX's market manipulation.

**A. The Celsius Liquidation**

109. On March 12, 2020, Celsius held a long position of 4,818,778 XBTM20 contracts in its BitMEX account, with an average entry price of USD/XBT 4,547.31. The position was secured by BTC transferred to BitMEX to act as collateral. Celsius's position would reach its MMR at a Mark Price of 4,020.5.

110. As BTC spot prices on the BitMEX platform declined during the BitMEX-driven liquidation cascade alleged above, Celsius transferred additional BTC collateral to avoid liquidation of its position. At 23:47:07 UTC, Celsius initiated an on-chain transfer of 350 additional BTC to its BitMEX account.

111. BitMEX knew the additional collateral was incoming. At approximately 23:52:30 UTC, BitMEX sent Celsius an automated email acknowledging that the 350 BTC deposit had been seen on the blockchain, that it remained unconfirmed, and that BitMEX would accept the transaction once it had at least one confirmation.

112. Less than two minutes later, at 23:54:26 UTC, BitMEX's Mark Price for XBTM20 abruptly fell to USD/XBT 4,020. That Mark Price caused Celsius's position to fall below its applicable MMR, triggering the Celsius Liquidation. As alleged above, BitMEX's Mark Price was the price BitMEX used to determine margin and trigger liquidations, and was calculated by reference to BXBT that BitMEX itself substantially influenced.

113. BitMEX first attempted a partial liquidation of Celsius's position by placing an order for 195,849 XBTM20 contracts at USD/XBT 4,002.50. When that order failed, BitMEX's Liquidation Engine took control of Celsius's entire position of 4,818,778 contracts. The Liquidation Engine then liquidated Celsius's position into the same rapidly declining market in

which BitMEX's Liquidation Engine was generating additional selling pressure and further liquidations.

114. At 23:54 UTC, BitMEX ultimately liquidated Celsius's position at an average price of USD/XBT 3,634.50, far below the MMR, causing Celsius to lose 1,325.8385 BTC. Less than one minute after the liquidation, at 23:55 UTC, the 350 XBT deposit was confirmed on the blockchain.

**B. The JST Liquidation**

115. On March 13, 2020, the JST account held a long position of 15,418,131 XBTM20 contracts, one of the most substantial on the platform at that time. The position was secured by BTC owned by Celsius, managed by JST on Celsius's behalf, and transferred to BitMEX to act as collateral.

116. At 02:16 UTC, the Mark Price reached a low of approximately USD/XBT 3,248. However, trading data indicates that the JST position was not liquidated at that time.

117. Instead, at approximately 02:16 UTC, the Outage occurred and the liquidation cascade that had been underway for hours was paused for approximately 25 minutes. During that time, the BTC spot price on BitMEX recovered from approximately USD/XBT 3,900 to approximately USD/XBT 5,300.

118. By approximately 02:43 UTC, the market deterioration on the BitMEX platform had resulted in sustained and extreme futures-index dislocations, with basis discounts reaching approximately 39%, spread expansion exceeding 7%, rolling volatility approaching 49%, and prolonged periods during which XBTM20 traded at significant discounts to BXBT.

119. Nevertheless, despite the recovery during the Outage, BitMEX reported a Mark Price at 02:50:28 UTC of only USD/XBT 3,422 and proceeded to liquidate the entire JST position

of 15,418,131 XBTM20 contracts. BitMEX recorded the full liquidation at an average price of USD/XBT 3,062.61, which appears to account for BitMEX's liquidation fee. In any event, the liquidation occurred substantially below contemporaneous spot BTC prices on other exchanges, and resulted in JST, and thus Celsius, losing digital assets valued at 5,034.3281 BTC.

## VI. BITMEX'S INSIDER TRADING DESK

120. BitMEX has long been accused of market manipulation.

121. In addition to designing pricing and liquidation mechanisms that fuel market disorder and liquidation events, BitMEX operated its own proprietary trading desk (the "Insider Trading Desk"), which was operated from BitMEX's Manhattan office, staffed by at least three employees, and managed by Dwyer. Its existence was first publicly revealed on April 30, 2018, after BitMEX had received substantial pressure from its customers.

122. On information and belief, the Insider Trading Desk had access and capabilities unavailable to ordinary customers; what others have referred to as "God Access"—real-time access to customer account, order-flow, execution, open-position, and liquidation information. That information allowed BitMEX to know where substantial customer positions were concentrated and the price movements that could place those positions at risk of liquidation.

123. BitMEX concealed the extent of these advantages from its customers. On information and belief, personnel associated with the Insider Trading Desk operated through anonymized "burner" email accounts and could trade on BitMEX and other cryptocurrency exchanges. Access to confidential customer position and liquidation information would give BitMEX the ability to trade with knowledge unavailable to other market participants, including knowledge of price levels at which substantial customer positions could become subject to liquidations.

124. Such capabilities are a breach of BitMEX's contractual obligations. The TOS disclosed that BitMEX operated "a trading arm that, amongst other things, transacts in products traded on the Trading Platform," and that the trading arm "primarily trades as a market-maker."[95] BitMEX represented that the trading arm was "organised to be separate and distinct from the business of the Trading Platform" and, critically, that it "does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user."[96] BitMEX further represented that its trading arm received "access and trading privileges only on the same terms as are available to any other user."[97]

125. Those representations were material to the allocation of information and power between BitMEX and its customers. Customers necessarily disclosed their positions, orders, collateral, and liquidation thresholds to BitMEX to use the platform. BitMEX expressly represented that its Insider Trading Desk would not receive preferential access to that information or preferential trading privileges.[98] Upon information and belief, BitMEX personnel also enjoyed access and trading capabilities unavailable to ordinary customers and could use that information to trade for BitMEX's financial benefit.

## VII. STANDSTILL AGREEMENT

126. On March 9, 2026, the parties entered into a standstill agreement (the "Standstill Agreement") suspending the running of applicable limitation periods. The Standstill Agreement

---

95 *See id.* § 6.3.

96 *See id.*

97 *Id.* Earlier versions of BitMEX's TOS were even more explicit concerning the proprietary nature of that operation. BitMEX's 2018 TOS described it as a "for profit trading business that, among other things, transacts in products traded on the BitMEX platform," while likewise representing that the trading business did not have preferential access to platform order flow, execution, customer, or other information and received access and trading privileges only on the same terms available to other users. *See* BitMEX, *Terms of Service* (archived Sep. 25, 2018), available at: https://web.archive.org/web/20200307112344/https://www.bitmex.com/app/terms.

98 *See id.*

identifies the dispute as arising from "certain liquidations that it asserts took place on BitMEX's trading platform on or around 12 and 13 March 2020."

127. The Standstill Agreement names Celsius Network Limited, Celsius Network LLC, and certain affiliates on one side, and HDR Global Trading Limited and its affiliates (including ABS, 100x Group, Shine, and HDR Bermuda) on the other.

128. Celsius asserts all applicable tolling doctrines, including equitable tolling, the discovery rule, fraudulent concealment tolling, and class action tolling. Celsius's claims are further tolled by *American Pipe* class action tolling. *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974). On April 23, 2020, a putative class action was filed in the United States District Court for the Southern District of New York, *Messieh v. HDR Global Trading Ltd.*, No. 1:20-cv-03232-ALC-SDA, based on substantially the same conduct alleged herein. The putative class claims were dismissed without prejudice on June 30, 2025, pursuant to Federal Rule of Civil Procedure 41(a)(2). Further, on July 23, 2026, another class action complaint was filed in the United States District Court for the Southern District of New York, *BKX Services Inc. et al. v. HDR Global Trading Ltd. et al.*, No. 1:26-cv-6259-RA based on substantially the same conduct alleged herein.

129. Neither Celsius nor JST was in a position to appreciate the scope of BitMEX's manipulative activities at the time the Liquidations occurred.

130. Prior to April 30, 2018, BitMEX concealed the existence of the Insider Trading Desk. Even after revealing its existence, BitMEX concealed the nature and scope of its operations, including its access to hidden customer information, ability to trade during lockouts, and use of burner accounts. BitMEX misrepresented the cause of the Outage, first attributing it to a "hardware issue" and later to "two DDoS attacks." The true circumstances of the Outage and BitMEX's role in the resulting Liquidations were not known to Celsius or JST at the time.

131. The running of any applicable limitation periods was further suspended by the Standstill Agreement entered into between the parties on March 9, 2026. The standstill period established by the Standstill Agreement expired on September 9, 2026.

## CAUSES OF ACTION

### COUNT ONE
### Breach of Contract
### (Against HDR)

132. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

133. BitMEX and its customers, including Celsius and JST, entered into enforceable contracts governed by the TOS. Celsius entered and performed under the TOS for its direct account and asserts the JST-related claims by assignment. The contractual relationship covered BitMEX's operation of the Trading Platform and the handling of customers' BTC collateral used to support XBTM20 positions.

134. The TOS imposed express obligations on BitMEX concerning the operation of the Trading Platform and the treatment of customer positions.

135. Section 6.3 represented that BitMEX's proprietary trading arm was "organised to be separate and distinct from the business of the Trading Platform," that it "does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user," and that it received "access and trading privileges only on the same terms as are available to any other user."

136. Section 1.12 expressly stated that it was BitMEX's responsibility "to maintain an orderly market" and authorized BitMEX "at [its] own discretion halt trading on the Trading Platform due to market disruption or other relevant external events." English law, which governs

the TOS, also requires that the exercise by BitMEX of its discretion under either Sections 1.10, which permitted BitMEX to liquidate positions, and 1.12, described above, be done honestly, in good faith, and without arbitrariness, capriciousness, or irrationality, the "*Braganza*" duty. *See Braganza v. BP Shipping Ltd* [2015] UKSC 17. That is because the interest of BitMEX when exercising those discretionary powers is directly opposed to those of its customers: each liquidation transferred customer collateral to BitMEX's Insurance Fund, giving BitMEX a direct financial incentive to permit and *induce* (rather than prevent) liquidations. Similarly, BitMEX's profit-generating liquidation engine would be most effective in periods of high volatility.

137. And Section 7.3 required BitMEX to "make reasonable efforts to ensure that the Services are available" and to "use commercially reasonable efforts to avoid downtime of the Services during anticipated peak hours."

138. BitMEX breached those obligations in several ways.

139. As explained above, on information and belief, BitMEX granted "God Access" to its Insider Trading Desk—a level of omniscient, unrestricted visibility into the trading platform that no ordinary user could ever hope to obtain, and that no honest operator would ever dream of deploying. This was not a bug, an oversight, or the unfortunate byproduct of some benign engineering decision. It was, on information and belief, a deliberate architecture of advantage: a purpose-built window through which BitMEX's own house traders could peer directly into the private positions, leverage, and liquidation thresholds of its users. Armed with that stolen foresight, the Insider Trading Desk did not merely observe—it pounced, trading against BitMEX's own users with the confidence of a card player who has been permitted to read every hand at the table.

140. The consequences of this arrangement were as predictable as they were devastating. A user who placed a trade on BitMEX was not, as he reasonably believed, matching wits against

an impartial market. He was walking blindfolded into a rigged casino in which the house not only dealt the cards but knew, in advance, exactly where his chips were most vulnerable. Every leveraged position became a target. Every liquidation price became a roadmap. And every customer's loss became, by design, BitMEX's gain.

141. It is impossible to reconcile that operation with BitMEX's unambiguous obligations under Section 6.3. Whatever elastic interpretation BitMEX may now strain to advance, no reading of that provision permits the platform to weaponize its customers' confidential data against them for the enrichment of its own insiders.

142. XBTM20 was marked against BXBT, the weighted index of the spot XBT prices on several other exchanges. The purpose of marking a derivative contract to such an index is to anchor its price to the broad, observable market for the underlying asset, so that the contract reflects the value of XBT rather than the idiosyncratic conditions of any single venue. For that reason, an index-marked contract is expected to trade in close alignment with its index, and for weeks prior to March 12, 2020, XBTM20 did exactly that, rarely deviating from BXBT by more than 3%.

143. Starting on March 12, 2020, the Mark Price of XBTM20 severely decoupled from the BXBT index. At approximately 23:20 UTC, the XBT market began a second steep decline and BXBT fell from 5,589 USD/XBT to 4,705 USD/XBT in under ten minutes. Despite XBT prices beginning to rebound across the constituent exchanges, XBTM20 continued to fall, and by 23:45 UTC it was trading almost 20% below BXBT.

144. During this decoupling, at 23:54:26 UTC, BitMEX's Mark Price for XBTM20 fell to USD/XBT 4,020, triggering the Celsius Liquidation.

145. The significance of the decoupling lies not in the fact that XBTM20 fell—the whole market fell—but in the fact that it continued falling long after the underlying BXBT had stopped

and the market outside BitMEX had stabilized. A sustained 20% gap between XBTM20 and a multi-exchange spot index cannot be explained by any change in the value of XBT itself, because the index, by design, reflects the value of XBT as it was actually trading across the market at that moment.

146. BitMEX concealed liquidation trades in its public data, but the only plausible explanation for the rapidly growing gap is that BitMEX's own market had ceased to function as a price-discovery venue and had instead entered a self-reinforcing liquidation spiral. Forced sales from liquidated leveraged positions were executed into an order book too thin to absorb them, driving the traded price down, which in turn triggered further liquidations. That divergence should have set alarm bells ringing at BitMEX, and it is the point at which a reasonable exchange operator would have intervened. BitMEX did not.

147. BitMEX's failure to act on March 12, 2020 gives rise to two independent breaches of its obligations under the TOS.

148. *First*, Section 1.12 requires BitMEX to maintain an orderly market. BitMEX had both the knowledge and the means to act. BitMEX had real-time visibility of the divergence and could see that its market had detached from every other major venue. The dislocation was neither marginal nor fleeting. A sustained *and growing* divergence from a broad index is, by any measure, an unambiguous signal of a disorderly market, and it persisted long enough for BitMEX to recognize it and respond.

149. *Second*, to ensure BitMEX can meet its obligation to maintain an orderly market, Section 1.12 expressly grants BitMEX the discretion to intervene to halt trading. That discretion—including any decision *not* to take action—must be exercised in accordance with BitMEX's implied "*Braganza* duty."

150. BitMEX's failure to intervene is a clear breach of that duty. A reasonable exchange operator would have intervened to arrest this mechanical feedback loop before it unnecessarily destroyed value. By halting trading, an exchange allows liquidity to replenish and buyers to return, and gives participants an opportunity to reassess in an orderly fashion rather than being swept along by a cascade.

151. Had BitMEX briefly suspended trading of XBTM20, that suspension would have broken the loop and allowed the contract to reconverge toward BXBT. By failing to intervene, BitMEX allowed the cascade to run its course and permitted positions, including Celsius's, to be liquidated at prices that bore no relationship to the actual market value of XBT. Those liquidations were not the product of the fair market's assessment of XBT's value; they were the product of BitMEX's failure to halt a self-feeding spiral that was itself a function of BitMEX's own Liquidation Engine colliding with the exchange's collapsed liquidity. BitMEX's failure to suspend trading was irrational, arbitrary, and driven by BitMEX's own financial interest rather than any legitimate contractual purpose.

152. BitMEX further breached its obligations under the TOS when it liquidated Celsius's position at 23:54:33 UTC. Celsius initiated a transfer of 350 XBT at 23:47:07 UTC to BitMEX; BitMEX acknowledged at 23:52:30 UTC that the deposit was seen but unconfirmed and stated that confirmation usually took 10–20 minutes or longer; nevertheless, when its Mark Price reached $4,020 at 23:54:26 UTC, BitMEX placed the liquidation order at 23:54:33 UTC and completed the liquidation before confirming the deposit at 00:01:28 UTC.

153. This too was a failure of BitMEX's *Braganza* duty. The exercise by BitMEX of its discretion to liquidate Celsius's position in circumstances in which BitMEX had knowledge of the pending deposit, knew that deposit would be received within minutes (as it in fact was), and knew

that it would cure any margin shortfall was wholly irrational and can have had no legitimate purpose.

154. BitMEX also breached those same obligations, as well as its distinct obligation to ensure reasonable availability, on March 13, 2020.

155. At 02:16 UTC on March 13, 2020, the BitMEX platform became inaccessible due to the Outage. From at least 02:16 UTC through 02:40 UTC, JST and other customers were locked out of the Trading Platform. During that window, JST could not deposit or post margin and could not reduce or close its open position.

156. When BitMEX's system came back online at approximately 02:40 UTC, the XBTM20 price had entirely detached from the rest of the market and at 02:45 UTC was now 40% below BXBT. Once again, BitMEX failed to take any corrective action.

157. At 02:50:28 UTC, with the platform still inaccessible to JST, the Liquidation Engine used a Mark Price of 3,422 USD/XBT despite the preceding best ask price being 4,502 USD/XBT, an incredible difference of 1,080 USD/XBT.

158. BitMEX's conduct on March 13, 2020 amounts to three independent breaches of the TOS.

159. *First*, BitMEX breached its obligation under Section 7.3 to ensure reasonable availability of the platform. BitMEX had a duty to not liquidate JST after the Outage had prevented JST from taking appropriate action to protect its position. Moreover, upon information and belief, BitMEX failed to take reasonable steps required by the TOS to prevent the alleged causes of the Outage.

160. *Second*, BitMEX breached its obligation to maintain an orderly market under Section 1.12, and its *Braganza* duty by failing to exercise its discretion to intervene so as to prevent

that disorder. Once BitMEX's system collapsed, it was incumbent on BitMEX to cancel the resting orders on the XBTM20 order book before permitting trading and, above all, liquidations to resume against it. Its failure to do so is the mechanism by which the Outage caused JST's loss.

161. The stale order book was a foreseeable hazard. An order book is a collection of resting bids and offers, each placed at a price its author judged reasonable at the moment it was entered. When the matching engine goes down, those orders do not disappear; they sit frozen in the book, unmatched and incapable of being matched, while no participant can add, amend, or withdraw them. As JST's own lockout confirms, it could neither post margin nor place buy orders during the Outage. The market for XBT, however, did not freeze merely because BitMEX's servers had stopped. It kept moving on every other venue in the world. The inevitable consequence of an outage of any material duration is therefore that, when the engine is restored, the book it inherits is stale and stacked with orders priced to a market that no longer exists.

162. During and after the Outage, the broad XBT market fell and then recovered sharply. By 02:50 UTC the spot median across exchanges stood at approximately 5,148 USD/XBT, and BitMEX's own perpetual contract, XBTUSD, had tracked that recovery to $4,568. BitMEX's XBTM20 book, by contrast, remained pinned near its pre-Outage lows, in effect replaying the market of some fifteen minutes earlier.

163. An exchange operator discharging its duty to maintain an orderly market would, in that situation, have taken reasonable steps following the Outage. BitMEX could have purged the stale book, canceling the resting orders so that a fresh book had to re-form at prices reflecting the live market before allowing matching to resume. A reasonable exchange operator would certainly not have run its Liquidation Engine, as BitMEX did, into an orderbook it knew—or plainly should have known—to be detached from every other venue. In resuming trading and liquidations against

the stale book, BitMEX caused forced liquidation sell orders to sweep down through a thin set of stale bids and executed at a price that existed nowhere but on BitMEX's own broken book.

164. BitMEX's breaches directly and proximately caused Celsius to lose 1,325.8385 BTC in the Celsius Liquidation and, through the assigned JST claims from trading on Celsius's behalf, 5,034.3281 BTC in the JST Liquidation. The losses were not caused merely by BTC volatility: the loss caused by the Celsius Liquidation followed BitMEX's decision to liquidate before confirming a known deposit, and loss caused by the JST Liquidation followed BitMEX's decision to maintain liquidation operations during a lockout and use a stale Mark Price. Further, both Liquidations were the direct result of Defendants' breach of the TOS by designing and implementing trading and liquidation procedures intended to artificially generate a disorderly market and fuel additional liquidations from which Defendants profited. Plaintiffs therefore suffered damages of at least 6,360.1666 BTC.

**COUNT TWO**
**Common Law Fraud**
**(Against All Defendants)**

165. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

166. Defendants made the Representations of material fact to Celsius and JST prior to the Liquidations.

167. Defendants knew the Representations were false at the time they made them, or made them with reckless disregard for their truth.

168. Defendants intended for Celsius and JST to rely on the Representations to induce Celsius and JST to transact on BitMEX.

169. These Representations were false or misleading in the circumstances pleaded. Contrary to the Representations, Defendants designed and operated a platform and liquidation system that amplified market dislocations rather than preventing unnecessary liquidations. BitMEX's Liquidation Engine generated cascading sell pressure that deepened the very price declines used to trigger further liquidations. BitMEX's Fair Price Marking methodology used Mark Prices that materially diverged from contemporaneous spot and order-book prices during the critical period, triggering liquidations at artificially depressed levels rather than avoiding them. BitMEX liquidated positions using methods that created sell walls set at unreasonable and irrational prices intended to distort the Mark Price, create disorderly markets, and drive down the price of its derivative products so that Defendants could trigger additional liquidations from which they profited. And BitMEX's Insider Trading Desk had access to customer account, order-flow, execution, open-position, and liquidation information unavailable to ordinary customers, and was not subject to the lockouts that prevented customers from protecting their positions—directly contradicting the Representations in that the trading business received no special access or privileges. Through the Insider Trading Desk, the Liquidation Engine, and control over the Mark Price methodology, Defendants possessed the means to move XBTM20 prices in directions that would maximize customer liquidations.

170. Defendants intended these Representations and omissions to induce Celsius and JST to use the platform, maintain positions, deposit BTC, and rely on BitMEX's stated mechanisms rather than take other protective measures.

171. Celsius and JST justifiably relied on the identified Representations and omissions when they entered and continued using the platform, maintained their positions, and entrusted BTC collateral to BitMEX.

172. The injury resulted from BitMEX's specific conduct and was a substantial factor in causing Plaintiffs' injuries.

173. As a result of Defendants' misconduct, Plaintiffs suffered actual damages of at least 6,360.1666 BTC, and are entitled to punitive damages and other appropriate relief.

## COUNT THREE
## Violation of New York General Business Law §§ 349 and 350
## (As to All Defendants)

174. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

175. Section 349(a) of the New York General Business Law declares it unlawful to engage in "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a).

176. Similarly, Section 350 of the New York General Business Law provides that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful." N.Y. Gen. Bus. Law § 350.

177. Defendants' conduct alleged herein was consumer-oriented under New York state law.

178. The Representations made by Defendants and/or their omissions regarding the nature and abilities of the Insider Trading Desk were materially misleading and likely to mislead a reasonable consumer acting reasonably under the circumstances.

179. The Representations acted as advertisements for Defendants and were false and materially misleading and likely to mislead a reasonable consumer acting reasonably under the circumstances.

180. As a direct and proximate result of Defendants' deceptive acts and practices and false advertising, Plaintiffs suffered injury by using the BitMEX platform, both directly and through the JST account managed for the benefit of Plaintiffs, which they would not have otherwise used if it had not been for Defendants' deceptive acts and practices and false advertising.

181. Defendants' violations were willful and knowing in that Defendants knew the Representations made by Defendants were false and/or the omissions regarding the nature and abilities of the Insider Trading Desk were material to Plaintiffs.

182. By reason of the foregoing, Defendants violated New York General Business Law §§ 349 and 350, and Plaintiffs are entitled to recover actual damages of at least 6,360.1666 BTC or statutory damages, whichever is greater, trebled statutory damages, injunctive relief, and reasonable attorney's fees, together with the costs and disbursements of this action.

**COUNT FOUR**
**Deceptive Device and Fraudulent Course of Business in Violation of 7 U.S.C. §§ 9(1), 25(a)(1)(B), (C)(iv) and CFTC Rule 180.1**
**(Against All Defendants)**

183. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

184. Section 9(1) of the Commodity Exchange Act (the "CEA") makes it "unlawful for any person … to use or employ … in connection with any swap, or a contract … for future delivery, … any … deceptive device or contrivance," in contravention of rules and regulations promulgated by the CFTC. 7 U.S.C. § 9(1).

185. CFTC Rule 180.1, 17 C.F.R. § 180.1(a), makes it "unlawful for any person, directly or indirectly, in connection with any swap, or . . . contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly . . . [m]ake, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in

order to make the statements made not untrue or misleading; or . . . [e]ngage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person."

186. The XBTM20 contracts traded through the Celsius and JST accounts are swaps or contracts for future delivery within the meaning of the CEA and Rule 180.1.

187. During the relevant time period, BitMEX was a domestic exchange having significant trading and managerial operation within the United States, and having thousands of U.S. customers actively trading swaps and contracts from the United States.

188. The XBTM20 contracts traded through the Celsius and JST accounts involve domestic transactions of swaps or contracts.

189. Defendants used a deceptive device and engaged in a fraudulent course of business in connection with those XBTM20 contracts in the circumstances pleaded, including by: (a) representing that Fair Price Marking existed to "avoid unnecessary liquidations" while operating a Liquidation Engine whose cascading sales amplified the very price declines that triggered those liquidations, and using Mark Prices that materially diverged from contemporaneous spot prices—including basis discounts reaching approximately 39%—to trigger liquidations at artificially depressed levels; (b) representing that BitMEX's liquidation procedures were intended to protect customers and create an orderly market while using methods that created sell walls set at unreasonable and irrational prices intended to distort the Mark Price, create disorderly markets, and drive down the price of its derivative products so that Defendants could trigger additional liquidations from which they profited; (c) operating the Insider Trading Desk without disclosing its existence, or after April 2018, without disclosing the full nature and scope of its operations, including its access to customer account, order-flow, execution, open-position, and liquidation

information, its immunity from customer lockouts, and its use of anonymous burner accounts to trade against customers; (d) misrepresenting the cause of the March 13, 2020 Outage, first attributing it to a "hardware issue with our cloud service provider" and later to "two DDoS attacks," when BitMEX knew or recklessly disregarded that its failure to remediate the vulnerability identified on February 15, 2020 contributed to the severity and duration of the Outage; (e) representing that the Insider Trading Desk received "access and trading privileges only on the same terms as are available to any other user" when the Insider Trading Desk in fact had privileged access to hidden customer information, priority access to trading systems, and immunity from the lockouts that prevented ordinary customers from protecting their positions; and (f) continuing to operate the Liquidation Engine and liquidate customer positions during the Outage while customers were unable to access the platform, add margin, modify positions, or place protective orders, without disclosing that BitMEX's liquidation processes would continue to operate during periods when customer access was impaired, and resuming trading and liquidations against an order book that BitMEX knew or should have known did not reflect current market prices.

190. The Representations and Defendants' other statements, omissions, and practices were material because they concerned the fairness, operation, availability, pricing, and liquidation of the platform and the circumstances under which customer positions and collateral could be seized. Defendants acted intentionally or recklessly and knew, or recklessly disregarded, that their conduct was misleading and fraudulent.

191. Defendants intended their fraud to induce Celsius and JST to trade on and maintain positions on the BitMEX platform, deposit and maintain BTC as collateral, and refrain from taking protective actions they otherwise would have taken.

192. Celsius and JST were induced to and did trade on and maintain positions on the platform, enter into and perform under the TOS, and entrust BTC collateral to BitMEX. Celsius and JST relied on Defendants' misrepresentations and omissions and could not reasonably have known the concealed facts concerning the Insider Trading Desk, customer lockouts, reference-exchange trading, and liquidation practices.

193. As a direct and proximate result of Defendants' violations of the CEA and Rule 180.1, Plaintiffs suffered actual damages of at least 6,360.1666 BTC, recoverable pursuant to 7 U.S.C. § 25(a)(1).

**COUNT FIVE**
**Manipulative Device and Contrivance in Violation of 7 U.S.C. §§ 9(1), 25(a)(1)(D)(i) and CFTC Rule 180.1**
**(Against All Defendants)**

194. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

195. Section 9(1) of the CEA makes it unlawful for any person to use or employ, in connection with any swap or contract for future delivery, any manipulative device or contrivance in contravention of rules and regulations promulgated by the CFTC. 7 U.S.C. § 9(1).

196. Rule 180.1, 17 C.F.R. § 180.1(a), likewise makes it "unlawful for any person, directly or indirectly, in connection with any swap, or . . . contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly . . . [u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud."

197. The XBTM20 contracts traded by Celsius and JST are swaps or contracts for future delivery within the meaning of the CEA and Rule 180.1.

198. During the relevant time period, BitMEX was a domestic exchange having significant trading and managerial operation within the United States, and having thousands of U.S. customers actively trading swaps and contracts from the United States.

199. The XBTM20 contracts traded through the Celsius and JST accounts involve domestic transactions of swaps or contracts.

200. Defendants employed manipulative devices and contrivances, including: (a) representing that Fair Price Marking existed to "avoid unnecessary liquidations" while operating a Liquidation Engine whose cascading sales amplified the very price declines that triggered those liquidations, and using Mark Prices that materially diverged from contemporaneous spot prices—including basis discounts reaching approximately 39%—to trigger liquidations at artificially depressed levels; (b) representing that BitMEX's liquidation procedures were intended to protect customers and create an orderly market while using methods that created sell walls set at unreasonable and irrational prices intended to distort the Mark Price, create disorderly markets, and drive down the price of its derivative products so that Defendants could trigger additional liquidations from which they profited; (c) operating the Insider Trading Desk without disclosing its existence, or after April 2018, without disclosing the full nature and scope of its operations, including its access to customer account, order-flow, execution, open-position, and liquidation information, its immunity from customer lockouts, and its use of anonymous burner accounts to trade against customers; (d) misrepresenting the cause of the March 13, 2020 Outage, first attributing it to a "hardware issue with our cloud service provider" and later to "two DDoS attacks," when BitMEX knew or recklessly disregarded that its failure to remediate the vulnerability identified on February 15, 2020 contributed to the severity and duration of the Outage; (e) representing that the Insider Trading Desk received "access and trading privileges only

on the same terms as are available to any other user" when the Insider Trading Desk in fact had privileged access to hidden customer information, priority access to trading systems, and immunity from the lockouts that prevented ordinary customers from protecting their positions; and (f) continuing to operate the Liquidation Engine and liquidate customer positions during the Outage while customers were unable to access the platform, add margin, modify positions, or place protective orders, without disclosing that BitMEX's liquidation processes would continue to operate during periods when customer access was impaired, and resuming trading and liquidations against an order book that BitMEX knew or should have known did not reflect current market prices.

201. These devices were designed to move BitMEX prices and reference prices in directions that would cause profitable liquidation cascades and to prevent customers from avoiding them. They caused the prices of XBTM20 contracts to be persistently artificial.

202. Defendants acted intentionally or recklessly, with knowledge that their actions would injure customers and benefit BitMEX through the liquidation process and Insurance Fund.

203. As a direct and proximate result of Defendants' violations of the CEA and Rule 180.1, Plaintiffs suffered actual damages of at least 6,360.1666 BTC, recoverable pursuant to 7 U.S.C. § 25(a)(1)(D)(i).

**COUNT SIX**
**Price Manipulation in Violation of 7 U.S.C. §§ 9(3), 25(a)(1)(D)(ii)**
**(Against All Defendants)**

204. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

205. Section 9(3) of the CEA makes it unlawful for any person, directly or indirectly, to "manipulate or attempt to manipulate the price of any swap, or of any commodity." 7 U.S.C. § 9(3).

206. Section 25(a)(1)(D)(ii) of the CEA provides a private right of action for actual damages resulting from manipulation of the price of a swap or the price of the commodity underlying the swap. 7 U.S.C. § 25(a)(1)(D)(ii).

207. The XBTM20 contracts traded by Celsius and JST are swaps or contracts for future delivery within the meaning of the CEA.

208. During the relevant time period, BitMEX was a domestic exchange having significant trading and managerial operation within the United States, and having thousands of U.S. customers actively trading swaps and contracts from the United States.

209. The XBTM20 contracts traded through the Celsius and JST accounts involve domestic transactions of swaps or contracts.

210. Defendants created persistently artificial prices through trading on their own platform via the Insider Trading Desk and through strategic trading on reference exchanges, including Coinbase, Bitstamp, and Kraken, causing short-lived price fluctuations on those exchanges to be reflected in BitMEX's derivatives.

211. Defendants had the ability to influence XBTM20 prices. BitMEX was a major source of price discovery in the BTC market, handling billions of dollars in daily trading volume. BitMEX derivatives had positive price spillover effects on major BTC spot markets, and trades on BitMEX led spot prices during market declines. Through the Insider Trading Desk, the Liquidation Engine, and control over the Mark Price methodology, Defendants possessed the means to move XBTM20 prices in directions that would maximize customer liquidations.

212. Defendants specifically intended to create artificial prices to maximize customer liquidations and profit through the Insurance Fund. Their motive was to convert price movements into liquidation proceeds, and their opportunity arose from their control of the Insider Trading Desk, Liquidation Engine, reference-price inputs, and Insurance Fund.

213. As a direct and proximate result of Defendants' manipulation of the prices of XBTM20 and the underlying commodity, Plaintiffs suffered actual damages of at least 6,360.1666 BTC, recoverable pursuant to 7 U.S.C. § 25(a)(1)(D)(ii).

**COUNT SEVEN**
**Principal-Agent Liability in Violation of 7 U.S.C. § 2(a)(1)(B)**
**(Against All Defendants)**

214. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

215. Section 2(a)(1)(B) of the CEA provides that "the act, omission, or failure of any … agent, or other person acting for any … corporation … within the scope of his employment or office shall be deemed the act, omission, or failure of such … corporation … as well as of such … agent, or other person." 7 U.S.C. § 2(a)(1)(B).

216. Each Defendant is liable for the fraudulent and manipulative acts and omissions of its agents, employees, and other persons acting for it within the scope of their employment or office.

217. HDR owned and operated BitMEX; ABS handled technical and operational aspects of the platform from New York; 100x Group was the holding structure for HDR and the BitMEX platform; Shine conducted proprietary trading on BitMEX and on reference exchanges; and HDR Bermuda employed personnel performing duties for BitMEX.

218. The Insider Trading Desk was operated by BitMEX personnel, and the related trading, lockout, pricing, liquidation, and communications conduct was undertaken within the scope of their employment and office.

219. Hayes, as CEO of both HDR and ABS, directed strategy and management of BitMEX, including the design of BitMEX's derivatives and its market-making algorithms. Delo oversaw BitMEX's trading engine. Reed, as CTO of both HDR and ABS, designed and oversaw BitMEX's website, API, and order-entry systems, and worked primarily from the United States. Dwyer, as Head of Business Development, managed the Insider Trading Desk from BitMEX's Manhattan office. Each of these individuals acted within the scope of their employment or office in connection with the conduct alleged herein.

220. Each Defendant participated in, facilitated, or benefited from the violations alleged in Counts Four through Six, including through the common BitMEX enterprise, the operation of the trading and liquidation systems, the handling of customer collateral, and the Insurance Fund.

221. As a direct and proximate result of the acts, omissions, and failures deemed to be the acts of the Defendants under 7 U.S.C. § 2(a)(1)(B), Plaintiffs suffered actual damages of at least 6,360.1666 BTC.

**COUNT EIGHT**
**Replevin**
**(Against All Defendants)**

222. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

223. Celsius and JST deposited their own BTC as collateral to trade on BitMEX's platform for their XBTM20 positions. At all times, the BTC remained the property of Celsius and JST.

224. BitMEX wrongfully took possession of and retained Celsius's and JST's BTC through the Liquidations. Those Liquidations were the product of BitMEX's fraudulent and manipulative conduct, and BitMEX therefore had no lawful right to seize or retain that property.

225. Through the wrongful Liquidations, BitMEX seized a total of 6,360.1666 BTC—consisting of 1,325.8385 BTC from the Celsius Liquidation and 5,034.3281 BTC from the JST Liquidation—that rightfully belongs to Celsius.

226. Upon information and belief, the wrongfully seized BTC, or its traceable proceeds, remains in the possession, custody, or control of one or more of the Defendant entities.

227. Plaintiffs are entitled to the return of their BTC in specie, together with any further relief necessary to effectuate that return.

**COUNT NINE**
**Unjust Enrichment**
**(Against All Defendants)**

228. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

229. Plaintiffs allege unjust enrichment against ABS, 100x Group, Shire, and HDR Bermuda, and as to HDR in the alternative.

230. BitMEX was unjustly enriched at Celsius's expense. The magnitude of BitMEX's enrichment is demonstrated by the growth of its Insurance Fund, which increased by 4,457 XBT during the March 12-13 period alone, reaching an intraday peak of 37,836 XBT.

231. BitMEX was also enriched by the seizure of 6,360.1666 BTC through the wrongful Liquidations.

232. BitMEX's enrichment came at the expense of Celsius and JST, whose collateral was seized and retained.

233. Under the circumstances, it would be against equity and good conscience to permit BitMEX to retain the benefit of the wrongfully seized BTC.

234. BitMEX placed the proceeds of the Liquidations into its Insurance Fund or otherwise retained them for its own benefit. Indeed, BitMEX has asserted that assets not paid out of the Insurance Fund belong to BitMEX, confirming that the accumulated BTC was retained for Defendants' own enrichment rather than for the benefit of the customers from whom it was taken.

235. Plaintiffs are entitled to restitution of the full value of the BTC wrongfully seized.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment and grant the following relief:

a) Actual damages of at least 6,360.1666 BTC, or the equivalent value thereof calculated at current BTC value, as determined at trial;

b) The return in kind of the 6,360.1666 BTC wrongfully seized through the Liquidations, or the equivalent current market value thereof;

c) Any and all applicable damages permitted by statute;

d) Punitive damages and any treble damages to the fullest extent permitted by law, in an amount to be determined at trial;

e) Disgorgement of all profits obtained by Defendants through the wrongful Liquidations, including all amounts held in or derived from the Insurance Fund attributable to the Liquidations;

f) Pre-judgment and post-judgment interest to the fullest extent permitted by applicable law;

g) Costs and reasonable attorneys' fees, together with all other recoverable litigation expenses; and

h) Any other relief the Court deems just, proper, or equitable.

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: New York, New York
September 12, 2026

**MCDERMOTT WILL & SCHULTE LLP**

*/s/ Joseph B. Evans*
Joseph B. Evans
Darren Azman
Steven T. Knipfelberg (*pro hac vice* forthcoming)
Daniel H. Kaltman
Joseph Aminov (*pro hac vice* forthcoming)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
jbevans@mcdermottlaw.com
dazman@mcdermottlaw.com
sknipfelberg@mcdermottlaw.com
dkaltman@mcdermottlaw.com
jaminov@mcdermottlaw.com

*Counsel to Blockchain Recovery Investment Consortium, LLC, Litigation Administrator and Complex Asset Recovery Manager, as Representative for the Post-Effective Date Celsius Debtors*